UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MAIN STREET ROI, LLC,

     Plaintiff,

v.                                                           Case No: 6:26-cv-1153-JSS-LHP

FRANCES C. FURGELE,

     Defendant.
_____/

**<u>PRELIMINARY INJUNCTION</u>**

Plaintiff, a digital marketing company, moves to convert the temporary restraining order (TRO) entered against Defendant, its former employee, to a preliminary injunction. (*See* Dkts. 8, 13, 17.) The court held an evidentiary hearing on this issue on June 23, 2026. (*See* Dkts. 15, 23, 24, 25.) Defendant has not yet appeared in this case. However, on June 5, 2026, a process server served on Defendant documents including a copy of the verified amended complaint with exhibits (Dkts. 4, 4-1, 4-2, 4-3, 4-4, 4-5), the instant motion for preliminary injunctive relief (Dkt. 8), the TRO (Dkt. 13), and the notice of the evidentiary hearing (Dkt. 15). (*See* Dkts. 20, 20-1.) Plaintiff also represents that it informed Defendant of the TRO and the hearing via email. (Dkt. 20 at 2.) Nonetheless, Defendant did not appear at the hearing and has not responded to the motion. (*See* Dkt. 25.) The motion is thus unopposed. In any event, upon consideration, the court grants Plaintiff's motion (Dkt. 8) and converts the TRO (Dkt. 13) to a preliminary injunction for the reasons explained below.

## BACKGROUND

Plaintiff's evidence supports the following facts. (*See, e.g.*, Dkts. 4, 8.) Plaintiff facilitates the growth of small businesses by offering digital marketing services and online educational resources. (Dkt. 4 ¶ 2.) To that end, Plaintiff partners with other organizations to serve its small-business clients. (*Id.* ¶ 4.) Plaintiff also provides services for search engine optimization, Google Ads management, Facebook and Instagram Ads, LinkedIn Ads, consulting, social media management, and marketing training. (*Id.* ¶ 2.) Plaintiff works with small-business owners, marketing managers, and marketing agencies and consultants. (*Id.* ¶ 4.) Plaintiff's services, which encompass account management, sales support, and referrals, are designed to assist its clients in measuring their marketing performance and in evaluating the return on their marketing investments. (*Id.* ¶¶ 3, 5.) To enhance customer websites and marketing campaigns, Plaintiff implements a comprehensive process. (*Id.* ¶ 51.) In addition, Plaintiff invests in protecting its confidential and trade secret information through physical and electronic security measures, as the information is central to the successful operation of Plaintiff's business. (*Id.* ¶ 56.)

Plaintiff reports that it acquired its proprietary information "at great expense and through substantial efforts." (*Id.* ¶ 53.) According to Plaintiff, its "trade secrets and confidential information are not readily ascertainable" because it "developed the information internally and took steps to preserve the confidentiality" of the information. (*Id.*) These steps include requiring employees to sign non-disclosure

agreements, using password-protected electronic systems, and restricting access for the confidential information to employees who need the information and have signed non-disclosure agreements. (*Id.* ¶ 54.) The misuse of Plaintiff's trade secrets and confidential information could cause Plaintiff significant harm: for example, Plaintiff could lose clients and business opportunities through unfair competition, and the value of the information itself could decrease. (*Id.* ¶ 55.) Accordingly, in Plaintiff's words, it "devotes substantial resources to the protection" of its information. (*Id.* ¶ 56.)

Defendant worked for Plaintiff from December 2021 to April 2026. (*Id.* ¶¶ 5–6.) She began as a writer, was promoted to marketing analyst in January 2022, and became an advertising team manager in April 2023. (*Id.* ¶ 63.) Accordingly, from April 2023 to her termination three years later, Defendant managed Plaintiff's advertising department. (*See id.*) During Defendant's employment with Plaintiff, Plaintiff introduced Defendant to customers—including prospective customers—and granted her access to Plaintiff's proprietary information. (*Id.* ¶ 64.) Plaintiff also assisted Defendant in fostering customer relationships. (*Id.*) Plaintiff entrusted Defendant with its trade secrets and confidential information so that Defendant could perform her job duties as an advertising team manager for Plaintiff. (*Id.* ¶ 57.)

Plaintiff describes the location of this information as Plaintiff's "internal Google Workspace environment," which "includ[es] Google Drive, Gmail, and related Google Workspace applications." (*Id.*) According to Plaintiff, the information includes six categories of "non-public, commercially valuable" data: (1) details related to Plaintiff's "current and inactive customers" including "pricing, service, and budget

amounts" and "the identit[ies] and contact information of decision[]makers," (2) "client and partner information," (3) "client lists," (4) "inactive client information," (5) "proprietary documents such as [Plaintiff's] internal process documents, templates, case studies, [and] financial information," and (6) "other non-public business records." (*Id.* ¶ 58.)  Plaintiff highlights three examples of its confidential information: its Client and Partner Master Sheet, its Sales Management Sheet, and its Scorecard Sheet.  (*Id.* ¶ 59.)  Reportedly, the Client and Partner Master Sheet "contains [Plaintiff's] full list of active clients, client websites, and fees," the Sales Management Sheet holds sensitive data respecting Plaintiff's current, inactive, and prospective clients, and the Scorecard Sheet "contains the company's historical financial information."  (*Id.*)  Plaintiff also purportedly "maintains proprietary documents that outline its internal processes" and "templates for managing client accounts," including "client meeting agenda templates, client performance journal document templates, client onboarding document templates, ad[vertising] campaign buildout sheet templates, and ad[vertising] management process sheets."  (*Id.* ¶ 60.)  Plaintiff does not share this information with the public.  (*Id.* ¶ 61.)  On the contrary, it protects the information through restricted-access permissions in its systems.  (*Id.*)

Plaintiff explains that "[i]n exchange for the benefits that employment with [Plaintiff] confers, [Plaintiff] requires that employees who have access to [Plaintiff]'s [c]onfidential [i]nformation and trade secrets, like [Defendant], sign a [n]on-[d]isclosure [a]greement requiring them to maintain in confidence all confidential and trade secret information" belonging to Plaintiff.  (*Id.* ¶ 62.)  Accordingly, as a condition

of her employment with Plaintiff, Defendant signed a non-disclosure agreement (Dkt. 4-1) on December 13, 2021. (Dkt. 4 ¶ 65.) Under this contract, Defendant must preserve the confidentiality of Plaintiff's information. (*Id.* ¶ 66; *see* Dkt. 4-1 at 1 ("[Defendant] shall hold and maintain [Plaintiff's confidential information] in strictest confidence for the sole and exclusive benefit of [Plaintiff].").) The contract prohibits Defendant from using the information for her own benefit and from disclosing the information to other parties. (Dkt. 4 ¶ 66.) Plaintiff states that Defendant is additionally "required to return any records, notes, and other materials pertaining to confidential information immediately upon written request." (*Id.* ¶ 67.) Plaintiff further states that as consideration for these contractual obligations, Defendant met Plaintiff's high-priority customers and prospective customers, gained access to confidential information, and received substantial compensation. (*Id.* ¶ 68.)

Plaintiff terminated Defendant's employment on April 30, 2026, and informed her that she was no longer permitted to access Plaintiff's accounts or systems. (*Id.* ¶ 69.) Nonetheless, Plaintiff's user logs show that in early May 2026, Defendant made multiple attempts to access Plaintiff's Google Workspace as well as a purportedly prohibited email account. (*Id.* ¶ 77; *see* Dkt. 4-5 (the user logs).) After these attempts, Plaintiff learned that Defendant had downloaded approximately fifty of Plaintiff's files between April 23 and 29, 2026. (Dkt. 4 ¶ 70.) According to Plaintiff, an audit indicated that these files contained "proprietary documents outlining [Plaintiff]'s internal processes and templates for managing client accounts, such as client meeting agenda templates, client performance journal document templates, client onboarding

document templates, ad[vertising] campaign buildout sheet templates, and ad[vertising] management process sheets." (*Id.*)

Plaintiff further reports learning that Defendant had "generated and downloaded a Google Takeout export containing data from multiple Google Workspace applications, including Gmail and Google Drive data" pertaining to Defendant's email account with Plaintiff. (*Id.* ¶ 71; *see* Dkt. 4-4 (computer records supporting Plaintiff's position).) According to Plaintiff, the Google Takeout export included Plaintiff's Client and Partner Master Sheet and Scorecard Sheet in addition to all of Plaintiff's "Google Workspace email data, including client communications and client contact information." (Dkt. 4 ¶¶ 71–72.) Plaintiff asserts that Defendant "attempted to hide [her] actions by deleting the activity." (*Id.* ¶ 71; *accord id.* ¶ 73 (stating that Defendant "deleted the email containing the link to the export").)

On April 27, 2026, Defendant downloaded her entire email account with Plaintiff, located within Google Workspace, and deleted nearly two thousand emails in the account. (*Id.* ¶ 74.) The same day, she copied information about Plaintiff's inactive clients from its Sales Management Sheet into her drive with Plaintiff. (*Id.* ¶ 75.) She designated the information Cancelled Clients and downloaded the information for herself. (*Id.*) Reportedly, although this information concerns inactive clients, it holds value to Plaintiff because Plaintiff interprets the information to improve its services and attempts to renew business with inactive clients. (*Id.*)

Plaintiff claims that Defendant has a history of engaging in unfair competition with Plaintiff during her employment with Plaintiff. On March 17, 2025, nearly two

years after she was promoted to her management position with Plaintiff, Defendant started a competing business, which holds itself out to the public as operating from Florida. (*Id.* ¶¶ 81–82; *see* Dkt. 4-2 (excerpts from the business's website showing the business's location in South Daytona, Florida).) Purportedly, the business's website refers to multiple case studies and results that are "directly based on [Plaintiff's] client data, [Plaintiff's] client work, [and] results that [Defendant] obtained during her employment" with Plaintiff. (Dkt. 4 ¶ 83.) Moreover, as of April 3, 2026, at the latest, Defendant was engaged in outside marketing work for another company—one of Plaintiff's direct competitors—while she was employed with Plaintiff. (*Id.* ¶¶ 85, 89.) Plaintiff reviewed emails concerning this outside work and discovered that initially, emails before April 27, 2026, did not appear in Defendant's inbox because Defendant had deleted them. (*Id.* ¶¶ 86–87.) Defendant did not have Plaintiff's permission to start the competing business or to perform the outside marketing work. (*See id.* ¶ 88.)

Defendant reportedly continues to state on her social media profiles that she is employed with Plaintiff even though her employment with Plaintiff has ended. (*Id.* ¶ 90.) After Defendant's termination, Plaintiff learned that on May 4, 2026, Defendant contacted a former employee of Plaintiff about a business account that Defendant knew Plaintiff was pursuing. (*Id.* ¶¶ 91–92.) On May 14, 2026, Plaintiff sent Defendant a written demand that she stop using Plaintiff's proprietary information and stop attempting to access electronic systems belonging to Plaintiff and to its clients and partners. (*Id.* ¶ 94; *see* Dkt. 4-3 at 1–5 (the demand letter describing Defendant's alleged misappropriation of Plaintiff's trade secrets, breach of the non-disclosure

agreement, breach of the duty of loyalty, and tortious interference with Plaintiff's business opportunities).)  Plaintiff made four additional demands: (1) that Defendant return all of Plaintiff's information and property, (2) that Defendant allow her electronic devices to be inspected by a third party, (3) that Defendant delete information associated with Plaintiff's clients and case studies from her competing business's website, and (4) that Defendant verify her compliance with all of Plaintiff's demands by submitting a sworn statement on or before May 18, 2026.  (Dkt. 4 ¶ 95.) Defendant did not comply with Plaintiff's demands.  (*Id.* ¶ 96.)

Given Defendant's alleged misconduct, Plaintiff initiated this case by filing a verified complaint on May 22, 2026.  (Dkt. 1.)  The operative verified amended complaint asserts five counts against Defendant: breach of the non-disclosure agreement seeking injunctive relief (count one), violations of the Defend Trade Secrets Act (DTSA), 18 U.S.C. §§ 1836–39, and the Florida Uniform Trade Secrets Act (FUTSA), Fla. Stat. §§ 688.001–.009 (counts two and three), breach of the common-law duty of loyalty (count four), and tortious interference with Plaintiff's business opportunities (count five).[1]  (Dkt. 4 ¶¶ 100–56.)  As remedies, Plaintiff requests preliminary and permanent injunctive relief in addition to monetary damages including actual, exemplary, and punitive damages and legal fees.  (*Id.* at 31–32.)  The verified amended complaint has been signed under penalty of perjury by Plaintiff's chief executive officer.  (*Id.* at 32.)

---

[1] The verified amended complaint misnumbers the tortious interference claim as count seven.  (*See* Dkt. 4 at 29.)  Plaintiff should avoid such misnumbering in the future.

At 5:15 P.M. E.T. on June 2, 2026, the court entered a TRO based on counts one, two, and three. (Dkt. 13.) The court ordered Plaintiff to deposit $25,000 in the court's registry as security for the TRO. (Dkt. 13 at 27.) Plaintiff was also required to comply with the service-related requirements in Local Rule 6.01(c) and was specifically directed to "ensure that Defendant receive[d] notice of" the evidentiary hearing about converting the TRO to a preliminary injunction. (Dkt. 13 at 27–28.) The court ordered Defendant to refrain from "retaining, copying, duplicating, using, or disclosing to any third party any trade secrets or confidential information relating to Plaintiff." (*Id.* at 27.) Defendant is also required to deliver documents to Plaintiff, to make electronic devices available to Plaintiff, and to "preserve evidence potentially relevant to this dispute." (*Id.* at 27–28.) Plaintiff deposited $25,000 in the court's registry on June 4, 2026. (Dkt. 16.) Further, as indicated above, Plaintiff informed Defendant of the hearing and satisfied its other service-related obligations via process server on June 5, 2026. (*See* Dkts. 20, 20-1.) However, as of the time of this order, Defendant has not fully complied with her obligations under the TRO, as discussed in Plaintiff's motion to hold her in civil contempt for this noncompliance (Dkt. 19).

Regarding its duration, the TRO states: "Under Federal Rule of Civil Procedure 65(b)(2), this TRO will expire fourteen days from the time and date listed below, unless the TRO period is extended in accordance with the rule." (Dkt. 13 at 28.) In light of the June 23, 2026 evidentiary hearing, the court extended the TRO period for good cause under Rule 65(b)(2). (Dkt. 17.) The TRO is currently set to expire twenty-eight days from 5:15 P.M. E.T. on June 2, 2026, in accordance with Rule 6.

## APPLICABLE STANDARDS

Federal Rule of Civil Procedure 65 governs TROs and preliminary injunctions. *See* Fed. R. Civ. P. 65.  The key difference is that whereas TROs may issue without notice to the adverse party, *see* Fed. R. Civ. P. 65(b)(1), "[t]he court may issue a preliminary injunction only on notice to the adverse party," Fed. R. Civ. P. 65(a)(1). "Every order granting an injunction and every [TRO] must . . . state the reasons why it issued[,] . . . state its terms specifically[,] and . . . describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1).  Rule 65 further states: "The court may issue a preliminary injunction or [TRO] only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c); *accord* M.D. Fla. R. 6.01(a)(4) (requiring a TRO motion to "include . . . a precise and verified explanation of the amount and form of the required security"); M.D. Fla. R. 6.02(a)(1) (requiring the same of a preliminary injunction motion).

"A TRO or preliminary injunction is appropriate where the movant" satisfies four requirements: (1) "there is a substantial likelihood of success on the merits," (2) "the TRO or preliminary injunction is necessary to prevent irreparable injury," (3) "the threatened injury outweighs the harm that the TRO or preliminary injunction would cause to the non-movant," and (4) "the TRO or preliminary injunction would not be averse to the public interest." *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034 (11th Cir. 2001); *accord* M.D. Fla. R. 6.01(b), 6.02(a)(1).  Preliminary injunctive

relief "is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to each of the four prerequisites." *Wall v. Ctrs. for Disease Control & Prevention*, 543 F. Supp. 3d 1290, 1292 (M.D. Fla. 2021) (alteration adopted and quotations omitted).

## ANALYSIS

The court discusses in turn the four requirements for preliminary injunctive relief: likelihood of success on the merits, irreparable injury, balance of harms, and public interest.

### A. Likelihood of Success on the Merits

Plaintiff is likely to succeed on the merits of its trade secret claims (counts two and three) and its contract claim (count one). The court considers these claims in turn.

### 1. Trade Secret Claims

The DTSA permits the "owner of a trade secret that is misappropriated" to "bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). To remedy misappropriation under the DTSA, courts may order injunctive and monetary relief. 18 U.S.C. § 1836(b)(3). The DTSA defines trade secrets broadly:

> [T]he term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if . . . the owner thereof has taken reasonable measures to keep such information secret[] and . . . the information derives independent economic value, actual or potential,

from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3). The owner of a trade secret is "the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed." 18 U.S.C. § 1839(4). Actionable misappropriation includes "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" as well as "disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret." 18 U.S.C. § 1839(5)(A)–(B)(i). Improper means include "theft, bribery, misrepresentation, breach [and] inducement of a breach of a duty to maintain secrecy, [and] espionage through electronic or other means." 18 U.S.C. § 1839(6)(A).

The FUTSA sets forth an analogous cause of action authorizing injunctive and monetary relief for the misappropriation of trade secrets. *See* Fla. Stat. § 688.003–.005. The FUTSA and DTSA also define trade secrets, misappropriation, and improper means similarly. *See* Fla. Stat. § 688.002(1)–(2), (4). Given the similarities between the statutes, courts often analyze DTSA and FUTSA claims together. *See Freedom Med., Inc. v. Sewpersaud*, 469 F. Supp. 3d 1269, 1275 (M.D. Fla. 2020) ("[The] DTSA and [the] FUTSA can be analyzed together."); *see also Compulife Software, Inc. v. Newman*, 959 F.3d 1288, 1311 n.13 (11th Cir. 2020) ("[The] DTSA creates a federal cause of action that largely mirrors [the] FUTSA. . . . [The court] assume[s], as the parties seem to, that the substantive standard for misappropriation is identical under

[the] FUTSA and [the] DTSA, at least as they apply here.  Accordingly, [the court will not] undertake a separate analysis of [the] DTSA claim.").

A plaintiff asserting a misappropriation claim under the FUTSA must satisfy two elements: (1) the plaintiff "possessed a trade secret and took reasonable steps to protect its secrecy" and (2) "the trade secret was misappropriated, either by one who knew or had reason to know the trade secret was improperly obtained or who used improper means to obtain it."  *Mapei Corp. v. J.M. Field Mktg.*, 295 So. 3d 1193, 1198 (Fla. Dist. Ct. App. 2020).  A DTSA plaintiff must satisfy these elements as well as the interstate commerce element.  *See It Works Mktg., Inc. v. Melaleuca, Inc.*, No. 8:20-cv-1743-T-KKM-TGW, 2021 WL 1650266, at *7, 2021 U.S. Dist. LEXIS 80298, at *20 (M.D. Fla. Apr. 27, 2021) (listing the three elements of a DTSA claim as "(1) the plaintiff owns a valid trade secret[,] (2) the trade secret relates to a product or service used in, or intended for use in, interstate commerce[,] and (3) the defendant misappropriated that trade secret").  Plaintiff has established all these elements.

To begin, Plaintiff has submitted evidence that its Client and Partner Master Sheet, Sales Management Sheet, and Scorecard Sheet contain trade secrets in the form of details about Plaintiff's customers, internal processes, and business strategies.  (*E.g.*, Dkt. 4 ¶¶ 58–61, 70, 75–76, 109, 121.)  *See Quality Lab. Mgmt., LLC v. Galvan*, No. 6:21-cv-588, 2021 WL 4935745, at *2, 2021 U.S. Dist. LEXIS 205750, at *5 (M.D. Fla. July 12, 2021) ("[The plaintiff]'s client lists, employee lists, and other confidential and proprietary business strategies constitute trade secrets under . . . the DTSA and the FUTSA."); *JetSmarter Inc. v. Benson*, No. 17-62541-CIV, 2018 WL 2709864, at *4, 2018

U.S. Dist. LEXIS 60113, at *11–12 (S.D. Fla. Apr. 6, 2018) ("Generally, Florida law considers a business's customer lists and the information contained therein to be trade secrets subject to protection if that information is compiled from non-public information and is kept confidential by the business." (collecting cases)), *report and recommendation adopted by* 2018 WL 2688774, at *1, 2018 U.S. Dist. LEXIS 71416, at *2 (S.D. Fla. Apr. 26, 2018).

Evidence also supports that Plaintiff has taken reasonable steps to preserve the confidentiality of this information, as by protecting the information with passwords in electronic systems and restricting access for the information to employees who need the information and have signed non-disclosure agreements. (Dkt. 4 ¶¶ 54, 56, 113.) *See Serrala US Corp. v. Paschke*, No. 3:21cv907-TKW-EMT, 2022 WL 2234971, at *4, 2022 U.S. Dist. LEXIS 112541, at *10-11 (N.D. Fla. May 16, 2022) ("[T]he complaint alleges . . . that [the p]laintiff takes numerous measures to guard the confidentiality of the [information], including requiring employees to execute confidentiality agreements and using password[-]protected access to the systems used for development and distribution[] of the [information]. These allegations are sufficient to show that [the p]laintiff has taken reasonable measures to keep the [information] secret." (citation omitted)); *Seacoast Banking Corp. of Fla. v. Diemer*, No. 6:20-cv-57-Orl-37LRH, 2020 WL 3266107, at *2, 2020 U.S. Dist. LEXIS 107005, at *5 (M.D. Fla. Feb. 3, 2020) ("[The plaintiff] took reasonable efforts to protect th[e] information by limiting access to employees on a need-to-know basis[.]"). Plaintiff can, therefore, establish the first element.

As to the second element, Defendant's misappropriation of Plaintiff's trade secrets, Plaintiff maintains that Defendant's late-April 2026 download of approximately fifty files containing proprietary information, together with her efforts to delete the activity, amounts to "strong evidence of misappropriation." (*See* Dkt. 8 at 23 (highlighting "[t]he timing of th[e] download, just days before [Defendant] was terminated," in addition to "the content of the download[] and the purpose of the download," presumably relating to unfair competition against Plaintiff); *see also* Dkt. 4 ¶¶ 69–76 (indicating that in the week leading up to her April 30, 2026 termination, Defendant downloaded the fifty files, created and downloaded a Google Takeout export including Plaintiff's Client and Partner Master Sheet and Scorecard Sheet, copied information from Plaintiff's Sales Management Sheet into a file that she then downloaded, downloaded her entire email account with Plaintiff, and deleted emails to conceal this conduct).)   The court agrees that this evidence demonstrates misappropriation.  *See Hayes Med. Staffing, LLC v. Eichelberg*, No. 0:23-cv-60748-GAYLES, 2024 WL 670440, at *8, 2024 U.S. Dist. LEXIS 34477, at *22–23 (S.D. Fla. Jan. 23, 2024) ("The timing of [the defendant]'s emails (*two days* before her resignation), how she sent them to herself (via *blind* copy and without permission), and her attempt to delete evidence of what she had done . . . constitute[] strong evidence of her intentional misappropriation of . . . trade secrets."); *see also Pliteq, Inc. v. Mostafa*, 775 F. Supp. 3d 1231, 1252 (S.D. Fla. 2025) ("[T]he timing of the download, the selection of confidential, trade secret information among the information in the download, and [the d]efendant's . . . purpose in using the downloaded

files . . . support [the] claim that [the d]efendant misappropriated the information under the DTSA."). The court further notes that according to the verified amended complaint, Defendant attempted to access Plaintiff's files electronically in the days following her termination even though Plaintiff had already informed her that she was no longer permitted such access. (Dkt. 4 ¶¶ 77–78.) *Cf. Prot. Techs., Inc. v. Ribler*, No. 3:17-cv-00144-LRH-WGC, 2017 WL 923912, at *2, 2017 U.S. Dist. LEXIS 33200, at *4 (D. Nev. Mar. 8, 2017) (granting a TRO in a DTSA case and explaining: "[T]he act of downloading company data *immediately after termination*, especially when coupled with attempts to hide these acts, indicates an intent to use this data against the company's interests." (emphasis added)).

Moreover, evidence indicates that Defendant used improper means to obtain the trade secrets. It indicates, for example, that through her employment, Defendant owed Plaintiff a duty to maintain the secrecy of the confidential information and that she breached this duty by—in Plaintiff's words—"exporting, downloading, copying, and retaining [Plaintiff]'s trade secret and confidential information without authorization." (Dkt. 8 at 23; *see* Dkt. 4 ¶¶ 57–68 (describing the rights and obligations inherent in Defendant's employment with Plaintiff).) *See* 18 U.S.C. § 1839(6)(A). In this case, Plaintiff alleges that Defendant agreed to a valid contractual restriction, (*see, e.g.*, Dkt. 4 ¶ 65; Dkt. 4-1), but "[e]ven in the absence of a contractual restriction, a former employee is precluded from using for h[er] own advantage, and to the detriment of h[er] former employer, confidential information or trade secrets acquired by or imparted to h[er] in the course of h[er] employment." *McGriff Ins. Servs., Inc. v.*

*Littlestone*, No. 2:21-cv-480-JES-NPM, 2021 WL 4750646, at *4, 2021 U.S. Dist. LEXIS 196006, at *12 (M.D. Fla. Oct. 12, 2021) (quoting *Erik Elec. Co. v. Elliot*, 375 So. 2d 1136, 1138 (Fla. Dist. Ct. App. 1979)). "[T]his rule has been affirmed or recognized in many cases dealing with the rights and duties of a former employee who solicits h[er] former employer's customers[] or otherwise uses h[er] knowledge of customer lists obtained in h[er] former employment." *Id.* (quoting same). Accordingly, Plaintiff has established the second element of its trade secret claims.

In light of the above, Plaintiff has shown a likelihood of success on the merits of the FUTSA claim. The DTSA claim requires Plaintiff to satisfy the interstate commerce element in addition to the other elements. According to the verified amended complaint, Plaintiff uses the trade secrets at issue to provide small businesses with online marketing services related to social media. (Dkt. 4 ¶¶ 2, 6, 47–48, 51–52.) Further, the verified amended complaint identifies Plaintiff as a corporation organized under New York law and headquartered in New York and states that during her employment with Plaintiff, Defendant "worked for [Plaintiff] from Florida" for nearly four years and "then worked primarily from Pennsylvania" until her termination. (*Id.* ¶¶ 30, 32.) Evidence thus supports that Plaintiff provides services to out-of-state customers and that Plaintiff's trade secrets are "related to a . . . service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1); *see KOVA Com. of Naples, LLC v. Sabin*, No. 2:23-cv-614-JES-KCD, 2024 WL 2019872, at *3, 2024 U.S. Dist. LEXIS 82718, at *6–7 (M.D. Fla. May 7, 2024) (collecting cases showing that the DTSA's interstate commerce element is satisfied when the plaintiff

provides services to out-of-state customers).  Consequently, Plaintiff has established the interstate commerce element and is likely to succeed as to its DTSA claim.

### 2.  Contract Claim

A breach of contract claim under Florida law has three elements: (1) "the existence of a contract," (2) "a material breach of that contract," and (3) "damages resulting from the breach."  *Marchisio v. Carrington Mortg. Servs., LLC*, 919 F.3d 1288, 1313 (11th Cir. 2019) (emphasis and quotation omitted).  "Florida law . . . contains a comprehensive framework for analyzing, evaluating[,] and enforcing restrictive covenants contained in employment contracts."  *Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1291 (11th Cir. 2022) (quotation omitted).  For a valid restrictive covenant, such as that found in a non-disclosure agreement, to exist, a plaintiff must establish "the existence of one or more legitimate business interests justifying the restrictive covenant."  *Id.* (quotations omitted); *see* Fla. Stat. § 542.335(1)(b) ("The person seeking enforcement of a restrictive covenant shall plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant.").  Additionally, the restrictive covenant must be "reasonable in time, area, and line of business," Fla. Stat. § 542.335(1), and must be "set forth in a writing signed by the person against whom enforcement is sought," *id.* § 542.335(1)(a).  Plaintiff has satisfied all the requirements to succeed as to its breach of contract claim.

Regarding the first element, the existence of a valid restrictive covenant, Plaintiff has demonstrated (1) that legitimate business interests justify the covenants in the parties' non-disclosure agreement, (2) that the covenants can be made reasonable,

and (3) that Defendant signed the agreement.  The third point appears undisputed. (*See* Dkt. 4-1 at 2 (showing Defendant's signature on the contract); Dkt. 8 at 25 ("[I]t is not in dispute that [Defendant] signed the [a]greement.").)  As for the first point, under Florida law, legitimate business interests include trade secrets as defined by the FUTSA, as well as "[v]aluable confidential business or professional information that otherwise does not qualify as trade secrets."  Fla. Stat. § 542.335(1)(b)1.–2.  Legitimate business interests may also include customer lists.  *See Fulford v. Drawdy Bros. Constr.*, 903 So. 2d 1007, 1007 (Fla. Dist. Ct. App. 2005) (identifying a company's customer list as a legitimate business interest); *Shields v. Paving Stone Co.*, 796 So. 2d 1267, 1268 (Fla. Dist. Ct. App. 2001) (same); *but see Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1234 n.11 (11th Cir. 2009) ("[T]he mere identity of [a company]'s clients as well as the pricing terms related to the company's projects . . . may not be sufficient to justify a restrictive covenant [under Florida law]."); *GPS Indus., LLC v. Lewis*, 691 F. Supp. 2d 1327, 1335 (M.D. Fla. 2010) (holding that a company's "customer and pricing lists and business plans . . . d[id] not constitute . . . legitimate business interests").  For the reasons explained above in connection with the trade secret claims, the information at issue constitutes trade secrets under the FUTSA and thus also qualifies as a legitimate business interest.  Fla. Stat. § 542.335(1)(b)1.  Alternatively, the information at least amounts to valuable confidential business information, including but not limited to customer lists.  *Id.* § 542.335(1)(b)2.; *see Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hagerty*, 808 F. Supp. 1555, 1558 (S.D. Fla. 1992) ("[The p]laintiff has a legitimate business interest in the [customer] list because it is a trade

secret.  [The p]laintiff, however, would have a legitimate business interest in the customer list even if it were not a trade secret.").

As for the second point, although the covenants in the parties' non-disclosure agreement are not facially reasonable, they can be made reasonable in time, area, and line of business as necessary.  *See* Fla. Stat. § 542.335(1)(c) ("If a contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect [a] legitimate business interest . . . , a court shall modify the restraint and grant . . . the relief reasonably necessary to protect [the] interest . . . .").  The non-disclosure agreement requires Defendant to "hold and maintain [Plaintiff's confidential information] in strictest confidence for the sole and exclusive benefit of" Plaintiff. (Dkt. 4-1 at 1.)  Relatedly, the agreement prohibits Defendant from using the information for her own benefit and from allowing other persons to use the information for their own benefit or to Plaintiff's detriment, unless Plaintiff approves of the use in advance in writing.  (*Id.*)  The agreement also prohibits Defendant from "publish[ing], copy[ing], [and] otherwise disclos[ing the information] to others" without Plaintiff's "prior written approval," and it requires Defendant to "return to [Plaintiff] any and all records, notes, and other written, printed, or tangible materials in [her] possession pertaining to [the information] immediately if [Plaintiff so] requests . . . in writing."  (*Id.*)  With respect to the time period for these covenants, the agreement provides that Defendant's "duty to hold [the information] in confidence shall remain in effect until the [information] no longer qualifies as a trade secret or until [Plaintiff] sends [Defendant] written notice releasing [her] from [the agreement],

whichever occurs first." (*Id.* at 1–2.)

In theory, the agreement could run in perpetuity, and Plaintiff certainly contends that the information still qualifies as trade secrets and that Defendant has not been released from her contractual duties. (*See* Dkts. 4, 8.) It would appear that the agreement is not limited in time, area, or line of business. (*See* Dkt. 8 at 27 (acknowledging that "the [a]greement does not contain any time limitation" while omitting any reference to area or line of business).) Nonetheless, the agreement's covenants are enforceable, as the court can modify them to reflect reasonable restrictions. *See* Fla. Stat. § 542.335(1)(c). Florida law creates a rebuttable presumption that a restraint lasting five or fewer years is reasonable in a trade secret case. *See id.* § 542.335(1)(e) ("In determining the reasonableness in time of a post[-]term restrictive covenant predicated upon the protection of trade secrets, a court shall presume reasonable in time any restraint of [five] years or less and shall presume unreasonable in time any restraint of more than [ten] years. All such presumptions shall be rebuttable presumptions."). If necessary, the court can impose such a temporal limitation on the parties' agreement and can similarly impose limitations related to area and line of business. *See Advanced RX Mgmt., LLC v. Perez*, No. 25-23193-CIV-ALTONAGA/Reid, 2025 WL 3541816, at *3, *5, 2025 U.S. Dist. LEXIS 257125, at *6–7, *12 (S.D. Fla. Aug. 1, 2025) (recognizing this principle when temporarily enjoining the defendants from interfering with the plaintiff's business relationships and contracts, from soliciting its clients by means of its confidential information, and from using and disclosing its confidential information and trade secrets); *id.* ("The restrictive

covenants in the [non-disclosure agreement]—which relate to [the defendant former employee]'s retention, use, or disclosure of [the p]laintiff's confidential business information—are valid and enforceable.  The restrictive covenants aim to protect [the p]laintiff's legitimate business interests under Florida law and only apply to [the p]laintiff's confidential information.  While the [agreement] states [that the defendant] is bound by the restrictive covenants in perpetuity following termination or resignation—making the temporal scope presumptively unreasonable—the [c]ourt has discretion to limit the term of a restrictive covenant to a reasonable period and five years is presumptively reasonable.  Similarly, although the [agreement] is not limited in geographic scope and thus may be overbroad, the [c]ourt has discretion to limit its scope to a reasonable area, such as . . . the location where [the defendant] allegedly breached the restrictive covenants." (quotation and citations omitted)).

For the foregoing reasons, Plaintiff has established the existence of valid contractual provisions—the first element of its contract claim.  Concerning the remaining elements, a material breach and damages caused thereby, Plaintiff states that although it sent Defendant a letter demanding the return of its property, she has not returned the property. (Dkt. 4 ¶¶ 94–96.)  Plaintiff further states that it "has been substantially damaged" by Defendant's unauthorized use of its confidential information for her own benefit in competing businesses. (*Id.* ¶¶ 98–99; *accord id.* ¶ 106 (alleging "irreparable harm and damages from [Defendant]'s breach" because she "misappropriated the information and put at risk its confidential status").)  These verified statements, in conjunction with other evidence, (*e.g.*, Dkt. 4-3), satisfy the

remaining elements.  *See Accellix, Inc. v. Aguilera-Sandoval*, No. 8:25-cv-440-TPB-AEP, 2025 WL 1069269, at *3, 2025 U.S. Dist. LEXIS 66473, at *8–9 (M.D. Fla. Apr. 8, 2025) (granting a preliminary injunction given the plaintiff's likelihood of success as to a breach of contract claim under Florida law, and explaining: "Prior to his resignation from [the p]laintiff, [the d]efendant was well-positioned to access and know its confidential and proprietary business information . . . .  [The p]laintiff provided [the d]efendant with access to this information only on the condition that he execute [an agreement], acknowledging his confidentiality and non-disclosure obligations, and his agreement not to use such information on behalf of a competing company.  By operating a competing company . . . , [the d]efendant has breached [the agreement]."); *see also Alexander Proudfoot Co. World Headquarters L.P. v. Thayer*, 877 F.2d 912, 920 (11th Cir. 1989) (observing, when applying Florida's long-arm statute in a personal jurisdiction analysis, that the defendant's "failure to return [confidential] materials to [the plaintiff] . . . constitute[d] a breach of a contract in Florida").  Therefore, Plaintiff is likely to succeed on the merits of its contract claim.  The court notes that "injunctions are a favored remedy for breaches of restrictive covenants" because "it is inherently difficult to determine what damage actually is caused by the employee's breach of . . . a restrictive covenant."  *Proudfoot*, 576 F.3d at 1243 (alteration adopted and quotation omitted).

## B.  Irreparable Injury

As indicated above, Plaintiff represents that although Defendant has been reminded of her confidentiality obligations under their contract and under federal and

Florida trade secret statutes, she still refuses to return Plaintiff's information. (Dkt. 8 at 27–28.) Plaintiff further represents that Defendant has used its information to promote her competing business. (*Id.* at 28.) Evidence submitted by Plaintiff supports these representations. (*See* Dkts. 4, 8.) Defendant's alleged misuse of Plaintiff's information to compete with Plaintiff demonstrates irreparable injury. *See LA Potencia, LLC v. Chandler*, 733 F. Supp. 3d 1238, 1275 (S.D. Fla. 2024) ("Courts have routinely held that a defendant's use of proprietary information to solicit customers and clients to a direct competitor of the plaintiff risks irreparable loss of customers and business, goodwill, and market position and competitiveness." (alteration adopted and quotation omitted)); *see also I.C. Sys., Inc. v. Oliff*, 824 So. 2d 286, 287 (Fla. Dist. Ct. App. 2002) (describing harm as irreparable in a case involving the alleged misuse of trade secrets and customer lists).

Indeed, Florida law recognizes a presumption of irreparable injury when a contracting party breaches an enforceable restrictive covenant. *See* Fla. Stat. § 542.335(1)(j) ("The violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant."); *Proudfoot*, 576 F.3d at 1231 (acknowledging this provision). In this case, Plaintiff has established irreparable injury even without the statutory presumption. Additionally, "[a]lthough the [c]ourt finds that Plaintiff has clearly established irreparable harm, it further notes that monetary damages can[]not compensate Plaintiff for Defendant's unilateral breach of . . . confidentiality." *See Merrill Lynch*, 808 F. Supp. at 1560 n.3. The irreparable nature of Plaintiff's injury thus weighs in

favor of granting Plaintiff's motion.  *See id.*

## C. Balance of Harms

The balance of harms also counsels in favor of granting Plaintiff's motion. Plaintiff's verified amended complaint and the instant motion, along with the documents submitted with each, support that Defendant misappropriated trade secret information that Plaintiff uses to support its business.  (*See* Dkts. 4, 8.)  These filings also support that Defendant is currently relying on the confidential information to compete with Plaintiff in the marketplace.  (*See* Dkts. 4, 8.)  Plaintiff's argument that Defendant's actions have thus infringed on its "property rights in its trade secrets and valuable confidential information" is well-taken.  (Dkt. 8 at 30.)  *See Priority Payment Sys., LLC v. SignaPay, Ltd.*, 161 F. Supp. 3d 1294, 1304 (N.D. Ga. 2016) ("A party cannot use another's trade secrets so long as [the party's business] is substantially derived from the trade secrets.  The balance of hardships[] thus weighs in [the p]laintiffs' favor.  Equity demands that [the d]efendants be prevented from using [proprietary information] taken from [the p]laintiffs." (alteration adopted and quotation omitted)).

Further, the potential harm to Defendant is minimal, as she has purportedly chosen to breach her contractual obligations even after Plaintiff reminded her of them. *See Nat'l Staffing Sols., Inc. v. Sanchez*, 626 F. Supp. 3d 1247, 1255 (M.D. Fla. 2022) ("If an injunction is granted preventing [the d]efendant from disclosing and retaining [the p]laintiff's confidential information, there will be very little harm to [the d]efendant as [the injunction] will merely be preventing [the d]efendant from continuing to violate

the [confidentiality a]greement."); *Heartland Payment Sys., LLC v. Stockwell*, 446 F. Supp. 3d 1275, 1286 (N.D. Ga. 2020) ("[A]ny potential harm to [the defendant] is the result of enforcement of a [contractual provision] to which he agreed, and is outweighed by the potential harm to [the plaintiff] if the injunction is not entered." (alterations adopted and quotation omitted)).   In other words, Defendant "would suffer no legitimate harm" because the TRO "would only prevent [her] from using" confidential information that she is "not entitled to use." *See Clayton v. Howard Johnson Franchise Sys., Inc.*, 730 F. Supp. 1553, 1561–62 (M.D. Fla. 1988).

## D. Public Interest

The public has strong interests in preserving contractual rights and protecting confidential information.  *See Larweth v. Magellan Health, Inc.*, 841 F. App'x 146, 159 (11th Cir. 2021) ("The public has a strong interest in seeing that contract rights are respected." (quotation omitted)); *7-Eleven, Inc. v. Kapoor Bros., Inc.*, 977 F. Supp. 2d 1211, 1230 (M.D. Fla. 2013) (explaining that "encourag[ing] parties to adhere to contractual obligations" serves the public interest); *see also Nat'l Staffing*, 626 F. Supp. 3d at 1255 ("[T]he public interest is . . . served by protecting confidential information . . . .").   In addition, the public has strong interests in promoting fair competition and, relatedly, discouraging unfair competition.  *See GMC v. Phat Cat Carts, Inc.*, 504 F. Supp. 2d 1278, 1280, 1288 (M.D. Fla. 2006) ("[T]he public is interested in fair competitive practices . . . .").   Defendant allegedly acquired confidential information through her employment with Plaintiff and then used the

information to compete against Plaintiff, in violation of not only her contract with Plaintiff but also trade secret statutes.  (*See* Dkts. 4, 8.)  Consequently, enjoining her from using the information serves these strong public interests.

**CONCLUSION**

Accordingly:

1. Plaintiff's motion (Dkt. 8) is **GRANTED**, and this preliminary injunction is **ENTERED**.

2. The $25,000 security that Plaintiff furnished to the court in connection with the TRO, (*see* Dkt. 13 at 26–27; Dkt. 16), meets Rule 65(c)'s security requirement such that Plaintiff need not provide additional security for the preliminary injunction.

3. Plaintiff shall immediately ensure that Defendant receives this preliminary injunction and, immediately after doing so, shall file a notice with the court establishing Defendant's receipt of the injunction.

4. Defendant is **PRELIMINARILY ENJOINED** from retaining, copying, duplicating, using, or disclosing to any third party any trade secrets or confidential information relating to Plaintiff.

5. Defendant has a continuing obligation to deliver to Plaintiff all documents, materials, and data (and copies thereof), in tangible, electronic, or intangible form, relating to Plaintiff and Plaintiff's business.

6. Defendant has a continuing obligation to make available for inspection and

imaging any computers, tablets, smartphones, external storage devices, personal data devices, and similar devices on which she accessed or retained Plaintiff's confidential information or trade secrets as well as any and all Cloud-based file management accounts (including Gmail, iCloud, and Dropbox), email accounts, or other devices or accounts on which Plaintiff's confidential information could reside.

7. Defendant has a continuing obligation to take all necessary steps to preserve evidence potentially relevant to this dispute, including but not limited to potentially relevant electronic evidence.

**ORDERED** in Orlando, Florida, on June 24, 2026.

JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties